SHEDD, Circuit Judge,
dissenting:
If the record supported the majority’s narrative that the district court failed to investigate Attorney Sonya Allen’s asserted conflicts of interest and forced Blackledge to participate in the civil commitment hearing without meaningful assistance of counsel, I would join the decision to vacate the judgment. However, the record establishes quite the contrary.
During two separate hearings, the magistrate judge and the district judge thoroughly considered Attorney Allen’s motions to withdraw as counsel, both of which were untimely, and gave Blackledge and Attorney Allen ample opportunity to address the purported conflicts. After personally observing their in-court interaction, the magistrate judge found that Black-ledge and Attorney Allen were able to communicate adequately in his defense; that finding — which was reviewed by the district judge — is not clearly erroneous. Moreover, the district judge explained why the purported conflicts did not prevent Attorney Allen from representing Black-ledge, and both judges recognized the prejudicial impact that granting the withdrawal motions would have on the government and the administration of justice. Further, Attorney Allen fully represented Blackledge at the commitment hearing, filing a prehearing brief, cross-examining witnesses, conferring with him about whether he would testify or present evidence, and making a closing argument.
Simply put, the district court did not abuse its discretion in denying the withdrawal motions. Because the court committed no discernible error, I dissent from the majority’s decision to vacate the judgment.
I
I begin with an overview of pertinent aspects of the Adam Walsh Child Protection and Safety Act, 18 U.S.C. § 4248. Enacted in 2006, the Act is “a modest addition to a set of federal prison-related mental-health statutes that have existed for many decades,” [1] but it “differs from earlier statutes in that it focuses directly upon persons who, due to a mental illness, are sexually dangerous.” United States v. Comstock, 560 U.S. 126, 137, 141, 130 S.Ct. 1949, 176 L.Ed.2d 878 (2010). The purpose of the Act is “to protect the public from the dangers posed by releasing sexually dangerous persons from federal custody,” United States v. Broncheau, 645 F.3d 676, 683 (4th Cir.2011), and if the district court “finds by clear and convincing evidence that the person is a sexually danger *200 ous person, the court shall commit the person to the custody of the Attorney General,” 18 U.S.C. § 4248(d) (emphasis added).
A § 4248 hearing is “civil in nature,” and “the constitutional rights to which a defendant in a criminal trial is entitled do not adhere to [the] respondent in [the] commitment hearing.” United States v. Wood, 741 F.3d 417, 423 (4th Cir.2013) (citation and internal quotation marks omitted). Moreover, “[a]s compared to the goal of a criminal trial, the goal of a commitment hearing is far different.” United States v. Baker, 45 F.3d 837, 844 (4th Cir.1995). The “basic issue” in a criminal case “is a straightforward factual question' — did the accused commit the act alleged?” Addington v. Texas, 441 U.S. 418, 429, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). A criminal trial serves “to uncover the truth by examining rigorously the reliability of conflicting evidence presented and then engaging in extensive factfinding,” and the “rights of cross-examination and confrontation, as well as the right to effective assistance of counsel, are all directed toward this goal.” Baker, 45 F.3d at 844. In contrast, the primary inquiry in a commitment hearing “involves a question that is essentially medical,” Vitek v. Jones, 445 U.S. 480, 495, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980), and it is based primarily upon the theoretical opinions of experts, Baker, 45 F.3d at 845. “The aim of cross-examination is changed accordingly: its goal is not to ‘poke holes’ in the testimony of a witness, but to test the expert opinion given and determine its basis and its limits.” Id.
When the government initiates a § 4248 civil commitment proceeding, the district court “may order that a psychiatric or psychological examination of the defendant be conducted, and that a psychiatric or psychological report be filed with the court pursuant to the provisions of [18 U.S.C. §§] 4247(b) and (c).” 18 U.S.C. § 4248(b). If the court finds more than one examiner “appropriate,” it may appoint additional examiners. 18 U.S.C. § 4247(b). Each examiner is designated by the court, except “upon the request of the defendant an additional examiner may be selected by the defendant.” Id. Regardless of whether the defendant selects the examiner, however, the § 4247(b) examiner serves as an “officer of the court, not responsible to prosecution or defense,” In re Harmon, 425 F.2d 916, 918 (1st Cir.1970), and must file his report with the court and provide copies to government and defense counsel, 18 U.S.C. § 4247(c).[2]
At the commitment hearing, the defendant “shall be represented by counsel and, if he is financially unable to obtain adequate representation, counsel shall be appointed for him pursuant to § 3006A.” 18 U.S.C. § 4247(d). Additionally, the defendant “shall be afforded an opportunity to testify, to present evidence, to subpoena witnesses on his behalf, and to confront and cross-examine witnesses who appear at the hearing.” Id.
To civilly commit an individual under § 4248, the government must prove by clear and convincing evidence that the person: (1) engaged in or attempted to engage in sexually violent conduct or child molestation (the “prior conduct element”); *201 (2) suffers from a serious mental illness, abnormality, or disorder (the “mental illness element”); and (3) because of the serious mental illness, abnormality, or disorder, would have serious difficulty in refraining from sexually violent conduct or child molestation if released (the “serious difficulty element”). United States v. Francis, 686 F.3d 265, 274 (4th Cir.2012).
When a district court determines (as a preliminary factual matter) that the government has proven the “prior conduct” element, it must then consider the “mental illness” and “serious difficulty” elements. These latter two elements “ensure that commitment is limited to inmates with a volitional impairment — inmates whose mental illness renders them dangerous beyond their control.” United States v. Wooden, 693 F.3d 440, 442 (4th Cir.2012) (citation and internal quotation marks omitted). Therefore, the court must evaluate “the individual’s present mental condition and the likely prospective effect of that mental condition on his volitional control;” this evaluation depends “on the significance of the factual information as viewed by the expert psychiatrists and psychologists.” Francis, 686 F.3d at 275. Compared to the first two elements, the “serious difficulty” element is “more complicated” because “it requires the court to issue a predictive judgment: has the Government met its burden by presenting clear and convincing evidence that, in the uncertain future, the respondent will have serious difficulty in refraining from sexually violent conduct or child molestation?” United States v. Antone, 742 F.3d 151, 159 (4th Cir.2014) (internal quotation marks and citation omitted).
II
With this backdrop in mind, I now turn to the pertinent facts. In my view, proper evaluation of the decision to deny the withdrawal motions requires a complete understanding of the facts of this case, but many critical facts are not acknowledged by the majority, and these facts tend to fatally undermine the majority’s decision.
A.
Blackledge has a substantial criminal history, which spans 45 years and includes a conviction for first degree murder, multiple convictions for producing and mailing child pornography, a conviction for sexual exploitation of a minor, and a probation violation for possessing child pornography. Based on this record, the government filed a “Certificate of Sexually Dangerous Person” against Blackledge in September 2009. In June 2010, the district court appointed the Federal Public Defender’s Office (“FPDO”) to represent Blackledge. Shortly thereafter, Blackledge moved to dismiss the case. The court denied that motion in January 2011. Initially, other FPDO attorneys represented Blackledge, but in March 2011, FPDO Attorney Allen replaced those attorneys.
Attorney Allen actively represented Blackledge in pretrial matters. As one of her discovery efforts, she obtained the appointment of Dr. Terence Campbell to provide a forensic evaluation of Blackledge pursuant to § 4247(b). Unfortunately for Blackledge, Dr. Campbell concluded that Blackledge meets the sexual dangerousness criteria for civil commitment. Upon receiving Dr. Campbell’s report, Attorney Allen attempted to have Dr. Joseph Plaud appointed as an additional forensic examiner, but the magistrate judge denied the motion without prejudice based on his finding that Blackledge had failed to establish a need for an additional court-appointed examiner. Blackledge did not appeal this order to the district judge. The deadline for discovery was December 22, 2011.
*202 On March 28, 2012, the district judge scheduled the commitment hearing for June 14. On April 17, FPDO Attorneys Katherine Shea and Debra Graves formally joined the case to represent Blackledge along with Attorney Allen. One month later, on May 16, Blackledge moved to reschedule the June 14 hearing based specifically, and only, on the fact that Attorneys Shea and Graves were unavailable because of prior commitments. The district judge granted this motion and rescheduled the trial for August 2.
On June 14, Blackledge filed a “renewed motion” to have Dr. Plaud appointed, to reopen discovery, and to reschedule the August 2 commitment hearing. Blackledge asserted that “securing an expert to testify favorably ... is of paramount importance to putting on an adequate defense.” J.A. 306. Opposing this motion, the government argued that Blackledge “has not shown a need for a second additional examiner, aside from the stated desire to secure an expert to testify favorably [for him]. Such a purpose 'falls outside the statutory provisions governing court-appointed examiners in this proceeding.” J.A. 77. In a subsequent reply memorandum supporting the motion, Blackledge asserted that this is a “battle-of-the-experts case” and that his ability to defend himself would be prejudiced without a favorable expert. J.A. 310.
The magistrate judge denied this motion on July 2, finding that it was untimely and that Blackledge failed to show that appointment of Dr. Plaud was necessary. The magistrate judge explained that Blackledge made “no representation that Dr. Plaud has reached a preliminary opinion that [he] does not qualify as a sexually dangerous person or that the other evaluations under § 4248 are somehow flawed based on a review of the records without a clinical interview. Such a record review [by Dr. Plaud] would not require court approval.” J.A. 314-15. Blackledge did not appeal this order to the district judge.
On July 10, just over three weeks before the scheduled trial date, Attorney Allen moved for an order allowing her and the entire FPDO to withdraw. In the motion, Attorney Allen asserted without further explanation that “an internal conflict has arisen and the undersigned can no longer ethically continue to represent” Black-ledge. J.A. 80. After the government filed a memorandum opposing this motion, Attorney Allen filed a reply memorandum, in which she stated: “To clarify the position of Respondent, Mr. Blackledge personally wishes to proceed in this matter with new counsel.” J.A. 86. Apart from this statement, Attorney Allen offered no further explanation for the motion, but she did ask for a hearing if the court desired additional information.
On July 17, Attorney Graves filed a notice that she had withdrawn from the case. The notice contains no explanation for her withdrawal.
B.
On July 18, the magistrate judge held a hearing on the withdrawal motion. The hearing lasted almost one hour, and Attorneys Allen, Graves, and Shea appeared on behalf of Blackledge. See J.A. 89. The magistrate judge began by confirming that Blackledge joined in the motion and was seeking new counsel. The magistrate judge then asked Attorney Allen to explain the “internal conflict” underlying the motion. Attorney Allen responded that “there are some things that [Blackledge] wants to see that I am not going to be able to help him with and because of that there’s a conflict that we just will not be able to resolve.” J.A. 91.
*203 After Attorney Allen spoke, the magistrate judge placed Blackledge under oath and asked him to explain his concerns. Blackledge stated that he had trouble getting documents from his attorneys and that he had “no confidence, or little confidence left in, that they can provide the kind of defense I need.” J.A. 93. The magistrate judge asked Blackledge to elaborate on that point, and Blackledge responded that it was “the fact that, just in getting documents and so forth from home. You ask for a copy and you never get any.” Id. When the magistrate judge asked what documents Blackledge wanted, he responded that “it’s very difficult to reveal what it is without showing my hand.” J.A. 95. At this point, the magistrate judge paused the hearing in order to allow Attorney Allen and Blackledge to confer. Id. When the hearing continued, Blackledge stated that although he initially could communicate with Attorney Allen, the relationship had become “strained,” and it was “very difficult ... to talk to someone ... you’ve lost confidence in. It’s difficult to share, ... if you think it’s going to be ignored, or you’re given short shrift.” J.A. 96. In response to the magistrate judge’s question, Blackledge stated that his attorney communication problems began “over six months ago.” Id. When asked why he did not raise the matter sooner, Blackledge admitted that he “let things go and I think I let them go too long in this case.” J.A. 97.
At this point, the magistrate judge asked Attorney Allen about possible replacement counsel. Attorney Allen stated that she understood a private attorney would accept the case, but that the attorney would not be prepared to go forward with the August 2 hearing. The magistrate judge then paused the hearing in order to permit Attorney Shea to confer with Blackledge. J.A. 99. When the hearing resumed, Attorney Allen stated that she understood why Blackledge had lost confidence in her, but she acknowledged that she could represent him “with great difficulty.” J.A. 101. The magistrate judge then spent some time explaining to Blackledge the role of a lawyer, after which the government attorney briefly stated the government’s position.
Following the government’s statement, Blackledge expressed his concern that he did not have an adequate defense because he did not have an expert witness who would testify on his behalf at the hearing. Blackledge also alluded to “other matters” but stated that he could not discuss them “because they are a part of my defense that were mishandled.” J.A. 106. Black-ledge then stated that all he wanted was “a level playing field and a fair shake and I don’t think I’m getting it the way things are now.” Id. The magistrate judge observed that Blackledge’s complaint was really about the orders denying Dr. Plaud’s appointment, to which Blackledge responded that he had been “laboring under the assumption” that Attorney Allen had procured a new expert examiner for him, only to find out that another expert had been “precluded by the Court.” J.A. 107. The magistrate judge explained that there was no basis under the circumstances for Blackledge to have another court-appointed examiner.
In response, Attorney Graves (who had previously withdrawn from the case) stated that Dr. Plaud had given “a preliminary determination ... that he could potentially clear” Blackledge for commitment. Id. Attorney Allen then admitted that she had neglected to move for another expert to be appointed in a timely manner, and she noted that this was “another conflict” and “one of the reasons” for the withdrawal motion. J.A. 108. Attorney Allen also stated that “[wjith no expert, there’s very little reason for [Blackledge] to have a trial *204 and he understands that.” J.A. 109. Finally, she acknowledged that Dr. Plaud was not “totally committed” to finding in Blackledge’s favor but was “willing to look at it.” Id.
The magistrate judge raised the possibility of conducting an ex parte hearing with Blackledge and Attorney Allen. J.A. 111. However, the magistrate judge asked Blackledge if he had anything further to add regarding his relationship with Attorney Allen, and Blackledge responded that he had adequately conveyed his position. Id. With that concession, the magistrate judge then announced his ruling from the bench.
Denying the motion, the magistrate judge first found that it was untimely. As the magistrate judge explained: “Mr. Blackledge ... states that he’s had concerns about his counsel going back for months and yet this motion is filed in a matter of weeks before the hearing in this case.” J.A. 113. The magistrate judge then noted the difficulties involved in scheduling commitment hearings and that a continuance would be necessary if the motion was granted. Finally, the magistrate judge stated that after considering the information presented, he had a “full picture of the nature of the problem” between Attorney Allen and Blackledge, and he did not believe that there was a breakdown in communication that would prevent an adequate defense. J.A. 114. In support of this point, the magistrate judge pointed out that Blackledge and Attorney Allen conferred “at Mr. Blackledge’s initiation in court today.” Id.
c.
On July 23, Attorney Allen filed an appeal of the magistrate judge’s order denying the withdrawal motion. As grounds for the appeal, Attorney Allen stated that the magistrate judge’s order is “contrary to law,” J.A. 119, specifically Maples v. Thomas, — U.S. —, 132 S.Ct. 912, 181 L.Ed.2d 807 (2012).[3] Although Blackledge had not cited or argued Maples to the magistrate judge, Attorney Allen argued that Maples stands for the proposition “that if court-appointed counsel in a civil habeas case misses an important deadline, that counsel thereafter has an irreparable conflict.” J.A. 119. Attorney Allen also stated that she had met with Blackledge, and he informed her that he “intend[ed] to file a complaint with the North Carolina State Bar against counsel because of her failure to obtain an expert in his case, unless she removes herself from his case.” J.A. 120. Attorney Allen acknowledged that allowing her to withdraw would disrupt the hearing schedule and cause the government “expense and inconvenience,” but she maintained that the government’s interests “cannot trump [Blackledge’s] right to effective counsel.” Id.
The following day, Attorney Shea filed a notice that she had withdrawn from the case. As with Attorney Graves, the notice contains no explanation for Attorney Shea’s withdrawal.
On July 26, Blackledge sent a handwritten letter to the district court stating that he had “written the bar association to dismiss the team of Shea, Graves, and Allen” and that he was “serious about wanting new blood and attentiveness to [his] defence [sic].” J.A. 129 (emphasis in original). *205 Blackledge did not include a copy of his bar complaint with the letter, and he provided no further explanation about it.
That same day, Attorney Allen filed Blackledge’s proposed findings of fact and conclusions of law. Evidently, she had discussed some aspects of the case with Blackledge because she foreshadowed his expected hearing testimony, stating (in predictive form) that he “denied possession and use of any drugs while incarcerated” and testified “with regard to the sex offender treatment and drug treatment he received in the past and his prior convictions for sexual conduct,” “about his conduct while incarcerated,” and “that he has received no infractions of any nature, sexual or otherwise” during his time at FCIButner. Respondent’s Proposed Findings of Fact and Conclusions of Law, No. 5:09-HC-2118-D-JG (E.D.N.C. July 26, 2012) (pages 14-15).
On July 30, Attorney Allen filed a “second motion” to withdraw as counsel. In this motion, she referenced Blackledge’s complaint with the state bar and stated that she believed she could no longer represent him.
On July 31, the parties’ Second Amended Joint Proposed Pre-Trial Order was filed. Attorney Allen signed the document on Blackledge’s behalf. In this document, Blackledge stipulated that “he has engaged in or attempted to engage in sexually violent conduct or child molestation” and that “he suffers from a serious mental illness, abnormality or disorder, specifically pedophilia.” J.A. 137. Based on these stipulations regarding the “prior conduct” and “mental illness” elements, Blackledge agreed there was only one issue to be decided at the commitment hearing: i.e., whether he would “have serious difficulty in refraining from sexually violent conduct or child molestation if released.” J.A. 138. Among other things, the government listed Blackledge as a potential witness, and it also designated his deposition transcript as potential discovery material to be used at the hearing.
D.
On August 2, the parties appeared before the district judge for the commitment hearing. As the hearing began, Attorney Allen asked the district judge to consider the withdrawal issue. The district judge responded that he had “read everything” and was prepared to “listen to anything you would like to add.” J.A. 148.
Attorney Allen stated that she had a conflict that could not be resolved and that Blackledge “feels he cannot get proper representation if [she] were to continue, and our relationship has deteriorated to a point that we cannot discuss his case, strategies of his case. We cannot effectively communicate.” J.A. 148-49. The district judge then asked Attorney Allen how her ability to cross-examine the expert witnesses would be impacted by her relationship with Blackledge. Without specifically answering this question, Attorney Allen referred to the state bar complaint, which she admitted she had not seen, and asserted that “it has certainly affected my ability to feel as if I can do everything in this case that is needed because I can’t even effectively communicate with my client.” J.A. 149-50.
The district judge noted that the case had been pending for a considerable period and that he was “very familiar with the record.” J.A. 150. Continuing, the district judge stated: “I have listened to the hearing that [the magistrate judge] had on the original motion to withdraw and I understand all the issues associated with Dr. Plaud and the scheduling order.” Id. The district judge observed that because of Blackledge’s stipulations, the case essen *206 tially boiled down to “an evaluation fundamentally of the experts and their persuasiveness,” id,., and he pointed out (based on his prior case experience) that because the government bore the burden of proof, Blackledge could potentially prevail without an expert witness. The district judge asked Attorney Allen if she had anything else to add to the motion. She responded that she had not been able to “appropriately” address with Blackledge the issue of whether he should testify. J.A. 151.
At the district judge’s invitation to speak, Blackledge stated that he was “being given a short shrift” and that the “playing field is not level.” Id. Blackledge also complained generally about Attorney Allen’s alleged failure on his behalf during discovery. Responding to a question from the district judge, Blackledge stated that, if pushed to the choice, he would rather be represented by Attorney Allen than proceed pro se.
In denying the motions, the district judge began with a thorough recitation of the history of the case. See J.A. 151-57. The district judge specifically detailed the hearing before the magistrate judge and the bases for the magistrate judge’s order denying the first withdrawal motion. The district judge stated that he had reviewed the magistrate judge’s order de novo and had fully considered the second withdrawal motion.
The district judge found that the motions were untimely and “[a]ny further delay would substantially prejudice the government and ... the public interest.” J.A. 159. The district judge explained that the trial dockets for the next several months were full, indicating that the delay caused by granting the motions would be lengthy.
The district judge then found that a thorough inquiry had been made into the issues. As the district judge explained, the magistrate judge “thoroughly engaged in an inquiry with Mr. Blackledge and Ms. Allen and the government,” and “[t]he issues associated with Dr. Plaud have been exhaustively examined.” J.A. 160.
The district judge further found that there was not a breakdown between Attorney Allen- and Blackledge that would prevent an adequate defense. The district judge noted that the government bore the burden of proof at the commitment hearing, and Attorney Allen was prepared to cross-examine the expert witnesses. Moreover, the district judge pointed out that the government “ha[d] the ability to call Mr. Blackledge as a witness and had planned to ... for some time.” J.A. 161. The district judge also explained that Maples was inapplicable because Attorney Allen had not abandoned Blackledge. Finally, the district judge observed that he had “looked into this whole issue of a bar disciplinary grievance” — which was “an undefined grievance but apparently just a dissatisfaction with how the ease came out.” Id. The district judge explained that the bar complaint did not create a per se conflict, and neither Blackledge nor Attorney Allen had presented any specific evidence to establish a conflict arising from the complaint.
After the district judge ruled on the withdrawal motions, Attorney Allen moved to bifurcate the commitment hearing to allow Blackledge the “opportunity to be examined by Dr. Plaud” and “an opportunity to possibly present a defense in the future.” J.A. 162. The government opposed the motion, and the district judge denied it, explaining that “there’s been no evidence that I have seen that [Dr. Plaud] would actually reach a different conclusion, other than apparently just perhaps the belief, to my knowledge, that he’s never found anyone in a 4248 case tried in the Eastern District of North Carolina subject to civil commitment.” J.A. 163. The dis *207 trict judge also noted that the motion was “inconsistent with the scheduling order and the public interest.” J.A. 163-64.
Thereafter, the commitment hearing proceeded on the merits. During the hearing, two expert witnesses — Dr. Christopher North and Dr. Terence Campbell— testified, and the forensic report of a third expert witness — Dr. Tonya Cunic — was admitted into evidence. Additionally, in lieu of calling Blackledge to the stand to testify, the government submitted his deposition. Receiving the deposition into evidence, the district judge noted that “to the extent there was an issue associated with trial preparation, I know that Mr. Blackledge appeared at that deposition with counsel and was prepared for that deposition by counsel.” J.A. 166. The district judge stated that this fact “further mitigates issues associated with any prejudice on the motion to withdraw.” Id.
Attorney Allen vigorously represented Blackledge. Among other things, she cross-examined Drs. North and Campbell, see J.A. 197-204, 220-33; conferred with Blackledge about whether he was going to testify, see J.A. 233; unsuccessfully moved for judgment as a matter of law, see J.A. 234; and presented a closing argument, see J.A. 241^45. Ultimately, the district judge found that Blackledge meets the § 4248 commitment criteria. The district judge explained its reasoning in detail, see J.A. 247-86, noting (among other things) that he read Blackledge’s deposition testimony as part of his consideration of the evidence, see J.A. 261-62.
III
On appeal, Blackledge does not challenge the district court’s finding that he meets the § 4248 criteria. Instead, he bases his arguments on the court’s denial of Attorney Allen’s withdrawal motions and his requests for the appointment of Dr. Plaud as an additional examiner. Specifically, he contends: (1) based on Maples, the court clearly erred in finding that Attorney Allen had not abandoned him; (2) because Attorney Allen abandoned him, the court abused its discretion by failing to equitably toll the discovery deadline to allow him to seek the appointment of Dr. Plaud;[4] (3) the court abused its discretion by failing to allow Attorney Allen to withdraw based on her conflict of interest; and (4) the court used an erroneous standard and, therefore, abused its discretion by refusing to grant his motion to appoint Dr. Plaud.
The majority grounds its decision to vacate the judgment only on the third issue, finding that the district court abused its discretion in denying the withdrawal motions. Before I address that issue, I believe that it is necessary to address the issues involving Dr. Plaud, which appear to be the genesis of Blackledge’s dissatisfaction with the proceedings below. As noted, Blackledge and Attorney Allen have argued throughout the case that he cannot avoid civil commitment without an expert testifying in his favor. See, e.g., J.A. 109 (Attorney Allen stating that “[wjith no expert, there’s very little reason for [Black-ledge] to have a trial and he understands that”). Blackledge emphasizes this point most succinctly in his appellate brief:
*208 Blackledge had no experts to help him ... and it seems highly probable that had he testified, his testimony would have failed to persuade the district court judge that he could refrain from further acts of sexual violence or child molestation .... In essence, the district court completely denied Blackledge a defense when it refused, to allow him the opportunity to pursue an additional expert forensic examiner.
Opening Brief of Appellant, at 34 (emphasis added). Given Blackledge’s view, I suspect that on remand this issue will almost certainly come up again.
In considering this issue, it is important to recall that the district court granted Blackledge his § 4247(b) right to select an examiner. Faced with an unfavorable diagnosis by his chosen examiner, Black-ledge sought to have Dr. Plaud appointed in the hope that he would render a more favorable diagnosis. Although Black-ledge’s desire to have an examiner testify favorably for him is understandable, nothing in § 4247(b) suggests that he is entitled to select multiple court-appointed examiners or, for that matter, to select an examiner who will testify on his behalf. See generally Wilson v. Greene, 155 F.3d 396, 401 (4th Cir.1998) (noting that due process “reflects primarily a concern with ensuring a defendant access to a psychiatrist or psychologist, not with guaranteeing a particular substantive result” (emphasis in original)).[5] Moreover, as the magistrate judge and the district judge observed, Blackledge has never presented any reason to suggest that Dr. Plaud will render a favorable diagnosis. See generally Taylor, 437 F.2d at 376 (“Where an examination has been conducted so recently as to furnish a basis for a determination of present competence, there is ordinarily no reason to order another.”).
Although I believe that Blackledge’s appellate arguments regarding Dr. Plaud likely fail on the merits, we need not reach them. Both of Blackledge’s motions seeking the appointment of Dr. Plaud were nondispositive, and they were referred to the magistrate judge. Following the denial of the motions, Blackledge did not appeal either magistrate judge order to the district judge.
Rule 72(a) of the Federal Rules of Civil Procedure provides that a party may serve and file objections to a magistrate judge’s order on a nondispositive matter within 14 days after being served with a copy, but the party “may not assign as error a defect in the order not timely objected to.” By failing to appeal the magistrate judge orders to the district judge, Blackledge has waived appellate review of the orders denying his motions to have Dr. Plaud appointed. See McDonald v. City of Saint Paul, 679 F.3d 698, 709 (8th Cir.2012).[6]
IV
I now turn to the withdrawal issues. In deciding whether to permit court-appointed counsel to withdraw, or to substitute court-appointed counsel on the defendant’s request, the district court must be guided *209 by the “interests of justice.” See 18 U.S.C. § 3006A(c); Martel v. Clair, — U.S. -, 132 S.Ct. 1276, 1285, 182 L.Ed.2d 135 (2012); see also United States v. Perez, 661 F.3d 189, 191 (4th Cir.2011) (using a “good cause” standard). This is a “peculiarly context-specific inquiry” that is “so fact-specific [that] it deserves deference.” Martel, 132 S.Ct. at 1287. We must accept the court’s factual findings unless they are clearly erroneous, see United States v. Keita, 742 F.3d 184, 188 (4th Cir.2014), and we may overturn a denial of a withdrawal motion only for an abuse of discretion, Martel, 132 S.Ct. at 1287, bearing in mind that “[t]he district court is far better situated than we are to observe and inquire into the state of the relationship between a defendant and his appointed counsel,” United States v. Smith, 640 F.3d 580, 590 (4th Cir.2011), and that the court has “wide latitude” in limiting a defendant’s right to counsel of choice based upon fairness and the demands of the court’s calendar, United States v. Gonzalez-Lopez, 548 U.S. 140, 152, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006).
As with any abuse-of-discretion review, we are obligated to exercise a “healthy measure of judicial restraint,” Evans v. Eaton Corp. Long Term Disability Plan, 514 F.3d 315, 323 (4th Cir.2008), reserving our power to correct only those district court decisions that “stray[ ] too far from the mark,” id. at 322. Therefore, we may properly find abuse of discretion where the district court has acted arbitrarily or irrationally, failed to consider judicially recognized factors constraining its exercise of discretion, relied on erroneous factual or legal premises, or committed an error of law. United States v. Thompson-Riviere, 561 F.3d 345, 348 (4th Cir.2009).
We have identified three relevant factors to consider in determining whether a district court abused its discretion in denying a withdrawal motion: (1) the timeliness of the motion, (2) the adequacy of the court’s inquiry into the matter, and (3) whether the client and counsel experienced a total lack of communication preventing an adequate defense. United States v. Reevey, 364 F.3d 151, 156 (4th Cir.2004). We weigh these factors against the district court’s interest in the orderly administration of justice. Id. at 157.
The majority holds that the district court abused its discretion in denying Attorney Allen’s withdrawal motions. Applying the pertinent factors, the majority finds that the timeliness factor “weighs somewhat” in support of the district court’s ruling, Majority Op., at 194, but it concludes that the other two factors do not. Specifically, the majority finds that “the district court did not meet its obligation to thoroughly inquire into the basis of the asserted conflict,” id. at 194-95, and this “failure to probe deeply into the basis of Attorney Allen’s conflict seriously undermines its decision,” id. at 195. Further, the majority finds that “Attorney Allen labored under a conflict of interest that caused her communications with Blackledge to be so broken that a ‘fundamental step for adequate representation’— basic trial preparation — failed to occur.” Id. at 197. Explaining why the district court’s purported error is not harmless, the majority states: “[I]n proceedings that could result in lifelong incarceration for a person who has already served his full sentence, Blackledge was forced to be represented by a lawyer asserting multiple conflicts of interest with whom he had not prepared for trial because of their inability to communicate.” Id. at 198-99.
In my view, the record conclusively establishes that the district court did not abuse its discretion, much less err at all, in denying the withdrawal motions. Indeed, *210 as I explain below, each of the relevant factors fully supports the district court’s ruling. Moreover, Blackledge received a full and fair commitment hearing, and any purported defect in the district court’s consideration of the withdrawal motions is harmless.
A.
First, the findings by the magistrate judge and the district judge that the motions were untimely are not clearly erroneous. By his own admission, Blackledge lost confidence in Attorney Allen no later than early 2012. In July, a mere three weeks before the August 2 commitment hearing, and after Blackledge had previously obtained a continuance of the commitment hearing,[7] the issue of Blackledge’s purported dissatisfaction with Attorney Allen and her “internal conflict” finally came to light when she filed the first withdrawal motion. Despite the magistrate judge’s specific inquiry, neither Blackledge nor Attorney Allen offered any real justification for the delay in bringing the matter to the district court’s attention. Moreover, they did not challenge the magistrate judge’s finding of untimeliness in the appeal of the magistrate judge’s order to the district judge.[8]
B.
Second, the district court’s inquiry into the motions was more than adequate. Our caselaw illustrates that the district court conducts an adequate inquiry if it gives the defendant and counsel the opportunity to be heard regarding the nature of their relationship and the reason underlying the motion, considers what the attorney and defendant say in the context of the case as a whole, and explains the basis for its determination. See Perez, 661 F.3d at 192. We review the adequacy of the court’s inquiry in its totality, and when the attorney-client issue has been raised at different stages of the litigation, the court need not revisit each aspect of the issue at every stage. See Smith, 640 F.3d at 594-95.
The magistrate judge, who had been very involved in the case, spent almost one hour hearing from Blackledge and Attorney Allen, and he afforded them every opportunity to present their arguments. The magistrate judge specifically inquired about the purported internal ethical conflict, and he listened as Attorney Allen described it as arising from the fact that “there are some things that [Blackledge] wants to see that I am not going to be able to help him with.” J.A. 91. The magistrate judge then listened as Blackledge expressed his general dissatisfaction with Attorney Allen and his defense, with the fact that she had not provided him with certain unspecified documents, and with the fact that he did not have another expert examiner. At the end of the hearing, the magistrate judge inquired and even offered to conduct an ex parte hearing, and Blackledge told him that he had nothing more to say on the matter.
When the district judge considered the appeal of the denial of the first motion, *211 along with the second motion, he conducted a de novo review and similarly afforded Blackledge and Attorney Allen ample opportunity to argue their position.[9] The district judge stated that he was familiar with Blackledge’s attempts to have Dr. Plaud appointed, was aware of Black-ledge’s bar complaint, had read all of the filed material, and had listened to the audio of the magistrate judge hearing. Both judges explained their rulings in great detail, illustrating their careful attention and consideration. There simply is no reasonable basis to condemn this inquiry as being inadequate.
C.
Finally, the findings by the magistrate judge and the district judge that there was not a total breakdown in communication that would prevent Blackledge from mounting an adequate defense are not clearly erroneous. The standard by which we must judge the denial of a withdrawal motion is objective, and it therefore does not depend solely on the defendant’s dissatisfaction with his attorney’s performance. United States v. Myers, 294 F.3d 203, 206 (1st Cir.2002). As we have explained, the “breakdown” of communication between an attorney and the defendant must be “so great that the principal purpose of the appointment — the mounting of an adequate defense incident to a fair trial — has been frustrated.” Smith, 640 F.3d at 588.
This standard requires us to consider whether the defendant has justifiable dissatisfaction with his appointed attorney, which includes a serious conflict of interest or an irreconcilable conflict. Id. at 588 n. 4. However, justifiable dissatisfaction “is not established merely by a defendant’s frustration with counsel’s performance or disagreement with his tactical decisions.” United States v. Boone, 437 F.3d 829, 839 (8th Cir.2006). Moreover, the district court is not always required to substitute counsel even where a real conflict exists. For example, the court may properly deny substitution “when the defendant’s own behavior creates a conflict.” United States v. Morsley, 64 F.3d 907, 918 (4th Cir.1995); see also Smith, 640 F.3d at 591 (noting that a “defendant’s obstinacy” cannot force the district court to substitute counsel).
The magistrate judge personally observed the in-court interaction between Blackledge and Attorney Allen during the hearing on the first withdrawal motions, and he expressly found (based on his observation) that they were able to communicate about the case in a manner that allowed Blackledge to conduct an adequate defense. This finding — based on the magistrate judge’s direct observation — is not clearly erroneous.[10]
The district judge was aware of this finding, as well as the fact that Attorney Allen had communicated in some respects with Blackledge after the July 18 hearing and had filed pre-hearing documents on his behalf. Other than referring to the bar complaint and rehashing the same arguments they previously made, neither *212 Blackledge nor Attorney Allen presented any additional information to establish that she could not adequately represent him.[11] Moreover, the district judge observed that, based on the parties’ stipulations, the only issue to be litigated during the commitment hearing would be the “serious difficulty” element of the civil commitment analysis, and resolution of that element would boil down to the testimony and cross-examination of the expert witnesses. Of course, that is what Attorney Allen and Blackledge have repeatedly asserted during their attempt to have Dr. Plaud appointed. Notably, when asked by the district judge, Attorney Allen could not explain how her ability to cross-examine the experts was impacted by her relationship with Blackledge.
D.
The foregoing discussion amply illustrates that the district court did not abuse its discretion in denying the withdrawal motions.[12] Even assuming otherwise, however, the record makes it clear that the court’s error is harmless.
In United States v. Horton, 693 F.3d 463 (4th Cir.2012), the defendant filed a timely motion to substitute counsel, and the district court did not inquire into the reasons for the defendant’s dissatisfaction with his attorney. We assumed, without deciding, that the court abused its discretion, but we nonetheless found the error harmless. As we noted, notwithstanding the defendant’s dissatisfaction, the attorney provided an adequate defense: “For example, he filed pre-trial motions in limine, he cross-examined government witnesses, and he strongly advocated for his client throughout” the trial proceedings. Id. at 467. Moreover, we recognized that the defendant did not “identify — let alone show — any specific way in which his defense was hampered by any lack of communication with his counsel.” Id.
Here, the record reflects that Attorney Allen fully represented Blackledge at the commitment hearing. She filed a pre-trial brief, cross-examined the expert witnesses, *213 moved for judgment as a matter of law, conferred with Blackledge about whether he wished to testify or present evidence, and made a closing argument. Although the majority concludes that the alleged communication breakdown prevented Blackledge from preparing for the commitment hearing or discussing whether he would testify, those general assertions— even if true — simply do not establish that the hearing was unfairly tainted by the attorney-client relationship.
Notably, Blackledge has not offered any reason why he could not have testified or, more importantly, what relevant testimony or other evidence he would have presented had his relationship with Attorney Allen been better. Importantly, Blackledge stipulated to the first two elements of the civil commitment analysis, so there was no relevant evidence he could have offered on those elements. As the district judge correctly observed, the issue of civil commitment boiled down to one question: whether the government proved the “serious difficulty” element. Consistent with what Attorney Allen and Blackledge have repeatedly asserted, our caselaw establishes that resolution of this element depended on expert testimony, not on Blackledge’s testimony.[13] Perhaps the most telling observation concerning the irrelevance of any testimony he may have offered comes from Blackledge: “[I]t seems highly probable that had he testified, his testimony would have failed to persuade the district court judge that he could refrain from further acts of sexual violence or child molestation.” Opening Brief of Appellant, at 34.
In any event, regardless of whether they communicated before the hearing, and regardless of whether any of his testimony would be relevant, Attorney Allen had the opportunity to confer with Blackledge about testifying during the hearing, and he chose not to testify. Further, the district court reviewed Blackledge’s deposition testimony during his deliberations and was aware of the substance of what he would likely say at the hearing. Moreover, the district judge noted, and Blackledge does not dispute, that Blackledge was prepared by counsel before the deposition and represented by counsel during the deposition.[14]
*214 E.
Apart from my disagreement with the majority’s abuse-of-discretion and harmless error determinations, I also question its instruction on remand for the district court to “reconsider” the withdrawal motions “after engaging in the appropriate inquiry regarding the extent of Attorney Allen’s conflicts.” Majority Op., at 199. I suspect that on remand the district court will ask the same question that I have: What is left to consider?
As I have noted, the majority has found that “Attorney Allen labored under a conflict of interest that caused her communications with Blaekledge to be so broken that a ‘fundamental step for adequate representation’ — basic trial preparation— failed to occur,” Majority Op., at 197, and that he was “forced to be represented by a lawyer asserting multiple conflicts of interest with whom he had not prepared for trial because of their inability to communicate,” id. at 199. Given the definitive nature in which the majority has spoken, I fail to understand how the district court can “reconsider” these appellate findings or how it can do anything on remand other than appoint Blaekledge new counsel and conduct another commitment hearing. I suspect that if the district court “reconsidered” the motions on remand and denied them, my colleagues in the majority — to be consistent with the majority opinion — will overturn the district court’s decision if there is a subsequent appeal.
V
Based on the foregoing, I dissent. I would affirm the judgment of the district court.

. See 18 U.S.C. §§ 4241-4246.

. A § 4247(b) examiner differs from an expert authorized under 18 U.S.C. § 3006A. As one court has recognized, an examination conducted by an order of the court "is conducted to serve the court in a completely nonpartisan manner.... The expert appointed under § 3006A, however, is not originally and primarily an aide to the court, but rather is intended to serve the interests of the defendant.” United States v. Chavis, 476 F.2d 1137, 1141-1142 (D.C.Cir.1973); see also United States v. Reason, 549 F.2d 309, 311 (4th Cir.1977); United States v. Taylor, 437 F.2d 371, 377 (4th Cir.1971).

. In Maples, counsel appointed to represent a state habeas petitioner abandoned the case without notice, thereby causing the petitioner to miss a filing deadline. Because the petitioner missed the deadline, his federal habeas claim was dismissed on grounds of procedural default. The Supreme Court held that the attorneys’ abandonment of the petitioner constituted sufficient cause to excuse the default.

. I would hold that the district judge correctly found that Attorney Allen did not abandon Blackledge. Attorney Allen’s representation of Blackledge is in no sense comparable to the attorneys' conduct in Maples. In any event, I would also hold that the alleged abandonment did not prejudice Blackledge because the magistrate judge denied the second motion for the appointment of Dr. Plaud for two reasons, one of which was Blackledge's failure to demonstrate a need for the appointment. That reason is independent of the question of the timeliness of the motion, and it therefore moots the abandonment issue.

. Blackledge’s position raises an obvious question: how many examiners must the court appoint? Apparently, he would answer that the court must appoint as many examiners as it takes until one will testify in his favor. Otherwise, without such testimony, any commitment hearing would be, in his view, unfair. The absurdity of this position is self-evident.

. Attorney Allen asked the district judge to bifurcate the commitment hearing and asserted that bifurcation would allow Dr. Plaud the opportunity to examine Blackledge. However, that request was not an appeal of the magistrate judge’s orders, and it did not place the issue of whether Dr. Plaud should have been appointed before the district judge.

. In April 2012, Attorney Graves and Attorney Shea joined the case on Blackledge's behalf, giving him three FPDO attorneys of record. The following month Blackledge successfully obtained a continuance of the scheduled June 14 commitment hearing. Presumably, Attorney Graves and Attorney Shea were important to Blackledge’s case because he used their inability to attend the June 14 hearing as justification to obtain the continuance. Despite this fact, he presented no reason why they could not represent him in lieu of Attorney Allen.

. The majority appears to agree that the second withdrawal motion, filed just days before the commitment hearing, was untimely. See Majority Op., at 194.

. The majority states that "the district court made no inquiry whatsoever into the scope and nature of” the "internal ethical conflict.” Majority Op., at 196. This assertion ignores the magistrate judge's thorough inquiry and the district judge's subsequent review of that inquiry. Moreover, as is apparent from the record, the purported "ethical” conflict involved nothing more than Blackledge’s general disgruntlement about Attorney Allen, his inability to see certain material, and his inability to obtain another court-appointed examiner.

. The record shows that the magistrate judge paused the July 18 hearing on two occasions in order to allow Blackledge to confer with Attorney Allen and Attorney Shea.

. The majority correctly states that "not every bar complaint against an attorney by her client will result in a conflict of interest." Majority Op., at 196. As we noted in United. States v. Burns, 990 F.2d 1426, 1438 (4th Cir.1993), "to hold otherwise ... would invite criminal defendants anxious to rid themselves of unwanted lawyers to queue up at the doors of bar disciplinary committees on the eve of trial.” Yet, the majority simply accepts the premise that Blackledge's bar complaint against Attorney Allen "forced her to choose between protecting her own reputation and arguing in her client’s best interest that Blackledge should not be made to bear the consequence of her own errors in submitting the renewed motion to appoint Dr. Plaud.” Majority Op., at 196. This assertion is not supported by the record, however, as Attorney Allen acknowledged on multiple occasions that she erred by not moving sooner for Dr. Plaud's appointment. For example, she told the magistrate judge at the July 18 hearing that she neglected to seek the appointment in a timely manner and that this was one reason that Blackledge wanted another attorney. See J.A. 108. Likewise, in the appeal of the magistrate judge’s order denying the withdrawal motion, she cited Maples and implicitly admitted (albeit incorrectly) that she had abandoned Blackledge. See J.A. at 119. In short, there is no evidence to establish that Attorney Allen’s ability to represent Black-ledge was compromised by the bar complaint.

. The pertinent factors strongly support the district court’s ruling, and there is no reason to weigh them against the court’s interest in the orderly administration of justice. However, for what it is worth, both the magistrate judge and the district judge explained that allowing Attorney Allen to withdraw would delay the commitment hearing, thereby prejudicing the government and its witnesses and impacting the court’s docket. Weighing this factor, therefore, also supports the court’s ruling.

. The majority analogizes a commitment hearing to a sentencing hearing, observing that it often "turn[s] on mitigating evidence as to the respondent’s continued dangerousness.” Majority Op., at 197. This analogy fails, however, because it ignores the fact that expert testimony is the relevant evidence for the "serious difficulty” element. Moreover, unlike a sentencing hearing, where a plea in mitigation can sway a district court towards leniency, the court’s duty to commit a defendant is mandatory if the government proves the elements by clear and convincing evidence.

. The majority asserts that the admission of Blackledge’s deposition into evidence indicates that the district judge found Black-ledge’s testimony to be relevant as to the "serious difficulty” element. See Majority Op., at 198 n. 6. The majority is incorrect for at least two reasons. First, we have a good indication that the district judge did not consider Blackledge’s testimony to be relevant to the "serious difficulty” element because the judge correctly noted early in the commitment hearing that the outcome of the commitment hearing hinged on expert testimony. Because Blackledge did not object to the government’s subsequent attempt to admit the deposition into evidence, the district judge had no reason at that time to address whether it was relevant to the "serious difficulty” element or to exclude it for any reason; in this posture, the admission of the deposition simply accords with our admonition that most evidence should be admitted in non-jury proceedings. See Multi-Med. Convalescent and Nurs. Ctr. of Towson v. N.L.R.B., 550 F.2d 974, 977-78 (4th Cir.1977). Second, and more importantly, the deposition was in fact relevant, but just not as the majority contends. Specifically, both of the experts who testified at the hearing relied on the deposi *214 tion in part to form their opinions regarding whether Blaekledge meets the commitment criteria, and they utilized the deposition during their testimony to help explain their opinions. See J.A. 184, 186, 187, 195, 215-16. The admission of the deposition was thus entirely consistent with the well-settled principle that the "serious difficulty” element "turns on the significance of the factual information as viewed by the expert psychiatrists and psychologists.” Francis, 686 F.3d at 275. Regardless, it bears repeating that to whatever extent the district judge may have believed Blacldedge's testimony was relevant, the judge had Blackledge’s deposition testimony before him, and Blaekledge has not explained what additional relevant testimony he would have given at the commitment hearing.